UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEVIN A. GARY

      Plaintiff,                      Case No:  2:17-cv-10544

v                                   HON. GERSHWIN A. DRAIN

TRUEBLUE, INC. d/b/a
LABOR READY, INC., d/b/a
PEOPLE READY, INC.

      Defendants.

_____/

| | |
|---|---|
| Kevin A. Gary | Scott W. Kramer (P69822) |
| Plaintiff *In Pro Per* | KUIPER ORLEBEKE PC |
| 3210 Hogarth | Attorneys for Defendants |
| Detroit, MI  48207 | 180 Monroe NW, Suite 400 |
| (313) 894-2330 | Grand Rapids, MI   49503 |
| kagary14@hotmail.com | (616) 454-3700 |
| | kraemer@kolaw.com |

_____

**DEFENDANTS TRUEBLUE, INC.'S AND PEOPLEREADY, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


### I.  INTRODUCTION

Plaintiff Kevin Gary's ("Plaintiff") Motion for Summary Judgment so blatantly misrepresents the record in this case that Defendants TrueBlue, Inc. and PeopleReady, Inc. ("Defendants") are in the process of bringing a motion for Rule 11 Sanctions against the *pro se* litigant.  Aside from his misrepresentations of fact to this Court, there are a litany of reasons why Plaintiff's motion must be denied.

First, Plaintiff fails to submit evidence allegedly supporting his claims that Defendants violated he Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. Most important, there is no evidence submitted to prove that an automated telephone dialing system ("ATDS") was used as that term is defined by the statute. More fundamentally, Plaintiff submits twelve (12) exhibits to his declaration in support of his summary judgment motion but he fails to lay foundation for, authenticate or even identify what those exhibits are. In fact, his declaration (Dkt. 21-3) makes reference to only one exhibit, "Exhibit I," which appears to be randomly selected and redacted portions of unverified discovery responses. It is impossible to interpret what the remaining documents purport to be or whether they are accurate.

Second, even if Plaintiff had evidence that an ATDS was used to message him (he does not), he consistently and routinely provided his consent to receive messages from Defendants. Not only that, but he worked hundreds jobs which were offered to him and he received the substantial benefit of payment for that work manifesting his consent to continue receiving text messages.

Third, Plaintiff fails to identify which messages he claims violated the TCPA. While he provides selected portions of what appear to be a text log between he and some other party he does not identify which messages he claims violate the act. Even if he were able to establish all other elements for a TCPA violation (which he cannot) he fails to identify the messages that alleged violated the act.

Finally, Plaintiff submitted declarations in bad faith which blatantly contradict the admissible record evidence. The declarations must be disregarded because no reasonable jury could believe Plaintiff's self-serving, false statements.

Denial of Plaintiff's motion is warranted with imposition of sanctions under FRCP 56(h).

## II. STATEMENT OF FACTS

### a. <u>PeopleReady and the WorkAlert System</u>

Labor Ready, the predecessor entity to PeopleReady, is a staffing company that helps place out of work, or underemployed blue collar workers with job opportunities, typically with local business in the communities it serves. (*Decl.* <u>*Knutson*</u>, **Exhibit A**, ¶ 2). PeopleReady places hundreds of thousands of employees in temporary staffing jobs each year. (*Id*. at ¶ 3). The jobs are often short term or even daily, and serve as a bridge to permanent employment for job seekers looking to build experience, or prove their worth in a highly competitive job market. (*Id.*). Consequently, PeopleReady's business relies on connecting qualified on-demand temporary workers with those looking to make a daily or short term hire in an efficient and expedient manner. (*Id.*). Traditionally, workers in this industry—and with Labor Ready—would arrive at a labor hall around 5:00 a.m. every morning to see whether there was any work available, and jobs were assigned on a first-come first-served basis. (*Id.*).

This somewhat antiquated process gave way – as is often the case – to technology that allows a more convenient way for temporary workers to find out about work opportunities. (*Id*. at ¶ 4). For PeopleReady this new technology is called the WorkAlert text messaging platform. Now PeopleReady connects people with work through traditional in-branch placement as well as through WorkAlert placement. (*Id.*). WorkAlert saves the potential worker time and money by cutting out the need to travel to the branch – sometimes daily – to determine if work is available on any particular day. Moreover, for those job seekers with childcare challenges, transportation issues, and other barriers to work, this system has greatly expanded opportunities to those who often need it most. WorkAlert also serves PeopleReady's customers because it allows for a

cost-effective, efficient way of communicating an available job offer to the right temporary worker--instead of who simply enters a labor hall first in the morning. (*Id.*).

PeopleReady branches interface with both customers and potential workers to find the right fit for each job. (*Id.* at ¶ 5). Workers are placed with a variety of different customers based on each customer's unique needs. (*Id.*). Workers are selected based on criteria set by both the customer and the PeopleReady branch employees. (*Id.*). Customers can select requirements for workers based on a multitude of factors, including, for example, whether the worker passed a background check, whether the worker holds a particular license or certificate, or whether the worker has worked another job in the last 30 days. (*Id.*). Likewise, the PeopleReady branch employees add their own criteria for workers over and above what the customer may require, including, for example, the workers' distance from the branch, whether the workers have their own source of transportation or whether the worker has checked in with the branch within the last 30 days. (*Id.*). The WorkAlert system not only effectively matches customers with temporary workers, but it allows PeopleReady to keep its prices down while providing employment opportunities nationwide based on the unique needs of its customers. (*Id.*).

When a PeopleReady branch employee needs to fill a customer's requirement for a local temporary worker they have the option of sending a message by SMS that allows the worker to learn of a job opportunity without having to spend time driving to or waiting at a hiring hall. (*Id.* at ¶ 6). Both the branch and temporary worker benefit by PeopleReady's ability to tailor an offer toward a particular worker who may possess certain skills or attributes desirable for a specific local job opportunity. (*Id.*). For example, a customer may need someone with experience in painting, and even if no person matches that skill set at the hiring hall, a worker who previously indicated that they had experience painting could now receive a text message offering them the job with that particular customer. (*Id.*).

It is always the PeopleReady branch employee's decision to offer an employment

opportunity to a potential temporary worker.  (*Id*. at ¶ 7).  When a customer contacts his or her local PeopleReady branch, the branch employee is tasked with finding temporary workers to staff the requested position, which will vary depending on many circumstances.  (*Id*.).  If the branch employee opts to use the WorkAlert text messaging program to fill the position, then the PeopleReady branch employee's first step in placing a temporary employee with a customer is to manually open the WorkAlert web browser application on their desktop computer in the branch office located in whatever city they may be in.  (*Id*.).  The branch employee is then required to manually input their credentials in order to log in to the system.  (*Id*.).

Next, the branch employee is taken to the "worker search" screen.  (*Id*. at ¶ 8).  On this screen the branch employee uses his or her discretion and independent judgment to input criteria to search for potential temporary employees to staff the position.  (*Id*.).  The branch employee then chooses to apply any combination of the following search criteria by manually selecting each separate criteria on the search screen:  desired zip code and distance from that zip code (these two criteria are required before a search can be conducted by the branch employee), whether the worker is available to take on new work, when the worker last "checked in" to learn about potential work assignments, any special skills required for completing the job assignment, whether the worker must have first passed a background check, whether the worker must have his or her own form of transportation, whether the worker must be licensed or hold a specialized certificate, when the worker was last dispatched, and whether the potential worker has worked for the same customer in the past.  (*Id*.).  The branch employee then manually hits the "search" button which returns a population of potential temporary workers for the branch employee to consider sending a text message to.  (*Id.*).  Sometimes the branch employee will refine the search to produce greater or fewer results based on the results of the first search.  (*Id.*).  The branch employee can also manually select specific persons from the list to include or exclude from the text message that will ultimately go out.  (*Id.*).

Once the branch employee is satisfied with the pool of potential temporary workers resulting from the search criteria selected, he or she then manually composes the text message that will go out to the employees that have opted into the WorkAlert program. (*Id*. at ¶ 9). There are no "form" or pre-written text messages that the branch employee can choose from during this process; rather, the branch employee must personally draft each text message by hand. (*Id.*). Finally, the branch employee manually clicks the "send" box in the WorkAlert box which triggers the sending of the message. (*Id.*).

The WorkAlert system limits the total number of persons a branch employee can text at a single time. (*Id*. at ¶ 10). If the search criteria selected by the branch employee are broad enough or the locale is too densely populated, then the results of any search that are produced will be limited by the system. (*Id.*).

Branch employees are not capable of making calls from the WorkAlert system. (*Id.* at ¶ 11). Employees cannot export the returned search results from WorkAlert to any other system, using software or by any other means. (*Id*.). There is no way to send a text message with the WorkAlert system without the several steps of human intervention described above. (*Id*.). While WorkAlert allows branch employees to send text messages to specifically-chosen potential temporary employees in groups that the branch employee creates, it does not allow for random or sequential messaging to potential temporary employees. (*Id*.). WorkAlert lacks the capability to randomly or sequentially dial or text potential temporary workers. (*Id*.). The logical reason for preventing WorkAlert from simply spamming every potential employee in a town, market or state, is that the entire purpose of WorkAlert is not to indiscriminately send messages (marketing or otherwise) to random individuals; rather, it is to reach out to job seekers to connect them with opportunities they had indicated they are interested in. (*Id*.). There is no technology that, if added to the WorkAlert system, would allow calls or text messages to be sent automatically and without any human intervention to groups of potential temporary

workers.  (*Id*.).

### b.  Plaintiff's Lengthy Employment with PeopleReady and his Repeated Express Consent to Receive WorkAlert Text Messages

Plaintiff first applied to work for Labor Ready on July 7, 2011.  (*Decl. Karczewski*, **Exhibit 1**).  In his application of that date, which Plaintiff signed, he gave his "express permission and consent" to be contacted by Labor Ready for the purpose of "alerting me to new job opportunities at Labor Ready."  (*Id*.)  On April 18, 2014, Plaintiff texted "Yes" to be opted into the WorkAlert text messaging system.  (*Decl., Karczewski* **Exhibit 2**).  He was then informed "You're now signed up to receive job alerts from Labor Ready that match your skills.  Reply STOP to cancel, HELP for help.  60 msg/mo Msg&data rates may apply."  (*Id*.)  At that point Plaintiff began receiving hand-crafted job offers from several branches in the greater-Detroit area.

He accepted job offers on May 11, June 2, June 5, June 10, June 17-18, June 22-23, June 28-30, July 7, July 9-10, July 17-18, July 20-21, July 29, August 1, August 7-8, August 13-15, August 20-21, August 23-25, September 5, September 7, September 12, September 19-20, September 22, September 29, and October 2-3 in the year 2014.  (*Id*. at lns.[1] 50-52, 90-91, 95-96, 122-23, 147-48, 189-90, 201-02, 216-217, 231-32, 241-42, 262-63, 265-66, 277-78, 297-98, 305-06, 313-14, 322-23, 336-37, 349-350, 363-64, 378-79, 386-87, 397-98, 426-27, 439-40, 461-62, 470-71, 478-79, 496-97, 531-33, 544-45, 566-69, 573-74, 586-87, 672-73, 683-84, 718-19, 729-30, 769-770, 775-76, 787-88, 798-799, 801-02, 805-06, and 818-19).

---

[1]     All citations to Exhibit 2, the text message log, pin cite to the line numbers ("ln") found therein.

He then, again, opted into receiving text messages on October 9, 2014 by texting "YES," and was alerted that "You are now signed up to receive job alerts from Labor Ready that match your skills.   Reply STOP to cancel, HELP for help.   60 msg/mo Msg&data rates may apply." (*Id.* at lns. 842-46).   Subsequently, he accepted job offers on October 17, October 22-23, October 30, November 6-7, November 16, November 21, November 25, November 27-30, and December 2, 2014. (*Id.* at lns. 897-98, 915-16, 920-21, 943-44, 989-90, 996-97, 999-1,000, 1,028-29, 1,044-45, 1,049-50, 1,052-53, 1,077-78, 1,095-1,096, 1,099-1,000, 1,105-1,106, and 1,110-11).   He continued accepting job offers on January 5, January 8 and January 14, 2015. (*Id.* at lns. 1,179-81, 1,185-86, 1,207-08, and 1,223-24).   He continued accepting job offers on January 5, January 8 and January 14, 2015. (*Id.* at lns. 1,179-81, 1,185-86, 1,207-08, and 1,223-24).   He again opted back into receiving text messages on February 9, 2015 and was sent the same confirmatory text message about how to opt out. (*Id.* at lns. 1,236-37).   He accepted job offers in March 15, 17-18, 20, 27, April 24, 28 and 29, 2015 before again explicitly asking to be messaged by Labor Ready, stating "You see my replying.   Put me on . This ticket . . . I am on the text alert." (*Id.* at lns. 1,341-42, 1,357-58, 1,361-62, 1,382-83, 1,386-87, 1,426-27, 1,561-62, 1,587-88, 1,617-18, 1,620-32).   He then accepted job offers via WorkAlert on May 1, 4, 5, 13-14, 19, 21-22, and 26-27, June 2, 4, 7-12, 14-19, 21-23, and 29, July 2, 3, 7, and 17, August 7, 1, 13-14, 17 and 19, September 8, 11-12, and 18-19, October 2, 10, 12, 23, and 30-31, 2015. (*Id.* at lns. 1,636-37, 1,660-61, 1,685-86, 1,743-44, 1,749-50, 1,766067, 1,771-72, 1,807-08, 1,825-26, 1,828-29, 1,839-40, 1,854-55, 1,860-61, 1,890-91, 1,899-1,900, 1,910-11, 1,922-23, 1,925-26, 1,931-33, 1,960-62, 1,983-84, 1,990-91, 1,994-95, 1,997-98, 2,055-06, 2,009-10, 2,021-22, 2,027-

29, 2,036-37, 2,069-70, 2,075-76, 2,090-91, 2,105-106, 2,124-25, 2,133-34, 2,188-89, 2,216-19, 2,259-2,260, 2444-45, 2459-60, 2,499-2,500, 2,502-03, 2,512-13, 2,532-34, 2,645-46, 2705-06, 2,715-16, 2,732-33, 2,873-74, 2,879-80, 2,945-46, 2,978-79, 2,991-92, 3,046-47, 3,059-60, 3,063-64)   He was opted out of receiving text messages due to inactivity on January 1, 2016.  (*Id*. at ln. 3,217).

Plaintiff then voluntarily and expressly opted back into receiving text messages on August 24, 2016, receiving the same confirmatory text message in response. (*Id*. at lns. 3,218-19).  He then accepted job offers on August 26, 30, and September 1, 5, 8, 15, 2016. (*Id*. at lns. 3,226-29, 3,238-39, 3,241-42, 3,251-52, 2,257-58, 3,294-95, 3,298-99, 3,323-24, 3,329-30, 3,337-38, 3,340-41).   On September 17, 2016 he sent two messages to Labor Ready.  The first stated "Please do not connect me anymore.  Thank you."  (*Id*. at ln. 3,347).  The next message, ten minutes later stated "Please don't contect (sic) me anymore."  (*Id*. at ln. 3,348).   Importantly neither message clearly indicated that he wanted to withdraw his express, written consent to receive text messages from WorkAlert.  Even so, his actions indicated that he was very happy receiving the messages as he proceeded to accept job offers through WorkAlert on September 17, 19-20, 23-25, 28, and 30, October 1, 3, 5 and 7, November 8.  (*Id*. at lns. 3,369-72, 3,382-83, 3,425-26, 4,432-33, 3,436-37, 3,456-57, 3,462-63, 3,520-22, 3,542-45, 3,554-55, 3,577-80, 3,633-34, 3,664-69, 3,960-61, 3,963-64, 3,967-68).

Not finished yet, Plaintiff again opted back into WorkAlert by texting "START" on November 10, 2016, receiving the same confirmatory text message as before.  (*Id*. at lns. 4,008-09).  He continued accepting job offers on November 14 and 15, December 2, 7, 9, 11, 13, 14, 21, 27 and 28 of 2016.  (*Id*. at lns. 4,030-31, 4,054-44, 4,057-58, 4,065-

66, 4,360-61, 4,430-31, 4,436-37, 4,464-65, 4,470-71, 4,535-37, 4,576-79, 4,587-88, 4,594-95, 4,681-84, 4,695-96, 4,709-10).  He continued accepting job offers in 2017 on January 5, 9, 13, 17, 20-21, 23, 27, and February 17 and 22.  (*Id*. at lns. 4,749-50, 4,759-60, 4,767-68, 4,828-29, 4,842-43, 4,889-90, 4,892-95, 4,929-30, 4,979-80, 5,150-51, 5,195-5,204).  Then on February 23 at 6:50 a.m. he texted "Please do not contact me anymore.  Thank you" to which he received the following message "You are no longer signed up for PeopleReady mobile alerts. Reply with START to reactivate mobile alerts. TnCs at https://goo.gl/EYzmmF."  (*Id*. at lns. 5,207-08).  Two minutes later, at 6:52 a.m. he texted back "START" and received the same confirmatory response email set forth above.  (*Id*. at ln. 5,209).  Seven seconds later he texted back a slightly different sentence "Please don't contact me anymore" which did not solicit an automatic opt out response from WorkAlert.  (*Id*. at ln. 5,211).

Plaintiff continued receiving text messages from branch personnel via the WorkAlert system and on the morning of February 27 he again asked WorkAlert to "not contact me anymore" only to again opt back into receiving messages at 1:33 p.m. that same day by texting "START" to WorkAlert and receiving the same confirmatory response message, accepting another job offer for work *that same day*.  (*Id*. at lns. 5,232, 5,238).  Plaintiff would accept sporadic job offers throughout 2017, including on April 6, 14, 19-21, 24, 26-30, May 1-4, 21-22, 24-26, and 31, June 1, 3, 6, 20, 23-24, 26-29, July 6, 17, 19, 20, 23, 28, August 6-11, 15, September 14, 22 and October 4 and 17.  (*Id*. at lns. 5,278-79, 5,915-16, 6,086-87, 6,110-11, 6256-57, 6,289-92, 6,303-04, 6,320-21, 6,345-46, 6,390-91, 6,453-54, 6,461-62, 6,480-81, 6,484-85, 6,526-27, 6,551-52, 6,561-62, 6,589-90, 6,613-14, 6,634-35, 6,650-51, 6,991-92, 7,006-077, 7,081-82, 7,101-06,

7,109-10, 7,128-29, 7,198-99, 7,228-29, 7,257-58, 7,286-87, 7,338-39, 7,647-48, 7,780-82, 7,795-96, 7,826-27, 7,829-31, 7,861-62, 7,893-94, 7,921-22, 8,003-06, 8,010-11, 8,197-98, 8,281-82, 8,293-94, 8,330-31, 8,334-37, 8,378-79, 8,499-8,500, 8,637-38, 8,653-54, 8,682-84, 8,715-16, 8,727-28, 8,735-36, 8,755-56, 8,791-92, 9,065-67, 9,153-54, 9,195-96, 9,254-55).   Plaintiff has never been terminated from employment with PeopleReady.  (*Decl., Karczewski*, ¶ 4).

   c.   **Misrepresentations in Plaintiff's Moving Papers**

   Plaintiff's moving papers are rife with misrepresentations that cannot go unchecked by this Court.  Defendant's bullet point out those misrepresentations for the Court here:

- "Defendants retaliated against Plaintiff, and fired Plaintiff as a result of this lawsuit."  (Dkt. 21 at 2).  This is false.  Plaintiff filed his complaint on February 17, 2017.  (Dkt. 1).  Since then he has worked for Defendants on 69 occasions.  (*Decl. Karczewski*, **Exhibit 3**).  Plaintiff has never been terminated from employment with PeopleReady.  (Karczewski Decl., ¶ 4).

- "The Defendants routinely makes (sic) potential workers use the automated system ("work alert") or they would be suspended or fired and not able to provide for a living."  (Dkt. 21 at 3 and 8).  Plaintiff is well aware this is false as he claims to have asked to stop receiving text messages but still "continue to work."  (Dkt. 21-3).  Indeed, even when he opted out of receiving text messages Plaintiff still continued to work literally hundreds of days for PeopleReady.  (*Decl., Karczewski*, **Exhibit 3**).

- "On February 23rd and 26th, Plaintiff again text the work alert system on (4) four occasions and asked the system "to not contact him anymore." (Dkt. 21 at 7). This quoted language was never sent from Plaintiff to WorkAlert and is not supported by the evidence. Even more, on February 23 and 26, Plaintiff omits the very crucial fact that he, in fact, texted WorkAlert "START" to expressly opt in to receiving text messages. (*Decl., Karczewski*, Exhibit 2 at lns. 5,207-08, 5,232, 5,238).

- "After revoking consent to be contacted on his cellphone, Plaintiff received over five-thousand-six-hundred (5,600) text messages." (Dkt. 21 at 7). This is completely false and wholly unsupported by the evidentiary record. (*Decl., Karczewski*, Exhibit 2).

- "Plaintiff never provided consent to be contacted on his cellphone." (Dkt. 21 at 9). This is Plaintiff's biggest and most consequential lie. He provided his express written consent to receive text messages on eight (8) occasions. (*Decl., Karczewski*, Exhibit 1 and Exhibit 2 at lns. 2, 842-46, 1,236-37, 3,218-19, 4,008-09, 5,209, 5,232).

## III. LEGAL ARGUMENT

### a. <u>Legal Standards on Summary Judgment</u>

"Summary judgment is appropriate when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the nonmoving party, the movant is clearly entitled to prevail as a matter of law." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950 (9th Cir. 2009) (*Satterfield*), citing Fed.R.Civ.P. 56. A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id*.

The moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of a claim asserted.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).  Only then does the burden shift to the non-moving party to point to some evidence showing that a genuine issue of material fact does in fact exist.

### b. Legal Standards for TCPA Claims

#### i. *The TCPA does not Prohibit the Texting of Job Offers*

Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, "was enacted to 'protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers.'"  *Satterfield*, 569 F.3d at 954.  Congress enacted the TCPA because "telephone subscribers considered automated or prerecorded telephone calls . . . to be a nuisance and an invasion of privacy."  27 F.C.C.R. 1830, 1839 (2012).  "When it enacted the TCPA in 1991, Congress was responding to the significant increase in the use of the telephone to market goods and services that had left "'[m]any customers . . . outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.'"  *Hovila v. Tween Brands, Inc.*, No. C09-0491, 2010 WL 1433417 (W.D. Wash. Apr. 7, 2010) at *9, quoting Congressional Statement of Findings, § 2(6) of Pub. L. 102-243.  Congress' intent was to regulate machines that dial "blocks of telephone numbers."  H.R. Rep. No. 101-633 at 2 (1990).  "**[C]ourts [have] broadly recognize[d] that not every text message or call constitutes an actionable offense; rather, the TCPA targets and seeks to prevent 'the proliferation of intrusive, nuisance calls.**'"  *Ryabyshchuck v.*

*Citibank (S. Dakota), N.A.*, No. 11-CV-1236, 2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) at *2 (emphasis added).

When the TCPA was created in 1991, Congress did not consider whether the sending of a text message could violate the TCPA. *Satterfield*, 569 F.3d at 954. Thus, necessarily, the TCPA also failed to consider whether text messages that communicated possible employment opportunities between persons with a preexisting, established business relationship – as opposed to consumer marketing – should violate the TCPA. Such a business model had not come into existence at the time Congress created the TCPA. Indeed, Defendants have been unable to find a single case in the United States where the TCPA has been applied to communications related to offering individuals temporary employment. To put it directly, the notion that a company connecting workers through individualized text messages with job opportunities in their local communities would face the potential draconian, and company threatening penalties of the TCPA goes not only beyond Congressional intent, but it falls outside of common sense.

       ii. *The TCPA is only Triggered if an ATDS was used to Send Text Messages*

Here, 47 U.S.C. § 227 (b)(1)(A)(iii) makes it "unlawful for any person . . . to make a call . . . using any automatic telephone dialing system or an artificial prerecorded voice . . . to any . . . cellular telephone service . . . or any service for which the party is charged for a call." *Satterfield,* 569 F.3d at 950. The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity – to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." *Id*., citing 47 U.S.C. § 227(a)(1). A text message can qualify as a "call" under the TCPA. *Satterfield*, 569 F.3d at 954.

This motion will turn on whether WorkAlert system is an ATDS.  The FCC[2] has addressed the question of what qualifies as an ATDS on four occasions.  First, in 2003, the FCC reached the unremarkable conclusion that "'predictive dialers . . . fall within the meaning and statutory definition of 'automatic dialing equipment' and the intent of Congress.'"  *Luna v. Shac, LLC*, No. 14-CV-00607, -- F.Supp.3d --, 2015 WL 4941781 at *3 (N.D. Cal. Aug. 19, 2015) ("*Luna*"), quoting 18 F.C.C.R. 14014, 14092 (2003) at 14093.  Predictive dialers are equipment that merely "dial numbers from customer calling lists, rather than dialing numbers randomly or sequentially (i.e., increasing the phone number by one digit for each call)" (*Glauser v. GroupME, Inc.*, No. C-11-2584 PJH, 2015 WL 475111 at *5 (N.D. Cal. Feb. 4, 2015) ("*Glauser*"), citing 18 F.C.C.R. at 14093), and predictive dialers "'predict' when a telemarketer will become available to take a call, effectively queuing callers for the telemarketer" (*Marks*, 55 F.Supp.3d at 1293).  The FCC reiterated its conclusion with respect to "predictive dialers" in both 2008 and 2012.  23 F.C.C.R. 559, 566 (2008); 27 F.C.C.R. 15391, 15392 n.5 (2012).  The FCC's 2008 opinion also explained that "the 'basic function' of an autodialer is 'the capacity to dial numbers without human intervention.'"  *Glauser*, 2015 WL 475111, at *6, quoting 23 F.C.C.R. at 566.  In its 2015 opinion the FCC further explained the "human intervention" component of an ATDS.  *Sherman v. Yahoo! Inc.*, No. 13-CV-0041-GPC, -- F.Supp.3d -- , 2015 WL 8757028 (S.D. Cal. 2015) ("*Sherman*") at *3.  "[T]he FCC instructed that 'how the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.'"  *Sherman*, 2015 WL 8757028, at *3, quoting 30 F.C.C.R. 7961, 7975 (2015).

---

[2] "[T]he FCC has no authority to modify or definitively interpret any language in § 227(a) of the TCPA."  *Marks v. Crunch San Diego, LLC*, 55 F.Supp.3d 1288, 1293 (S.D. Cal. 2014).  The FCC's statutory interpretation of what constitutes an ATDS does not bind the courts.  *Satterfield*, 569 F.3d at 951.

In the text messaging context, the issue of whether equipment is an ATDS turns on whether the equipment has "the capacity to send text messages without human intervention." *Gragg v. Orange Cab Co.*, Inc., 995 F.Supp.2d 1189, 1193 (W.D. Wash. 2014) ("*Gragg*"), (emphasis added). *See also Glauser*, 2015 WL 475111, at *6; *Luna,* 2015 WL 4941781, at *4; *Derby v. AOL, Inc.*, No. 15-CV-00452, 2015 WL 3477658, at *4 (N.D. Cal. June 1, 2015) ("*Derby*"); *McKenna v. WhisperText*, No. 5:14-CV-00424, 2015 WL 428728 at *4 (N.D. Cal. Jan. 30, 2015) ("*McKenna*"); *Marks v. Crunch San Diego, LLC*, 55 F.Supp.3d 1288 (S.D. Cal. 2014) ("*Marks*"). This district adopted the human intervention test in *Duchene v. Onstar, LLC*, 2016 WL 3997031 at *4 (E.D. Mich. July 26, 2016).

### iii. *The TCPA does not Apply when the Plaintiff has Provided Express Written Consent to Receive Text Messages*

"There is no one way to provide consent.  'Neither the Commission's rules not its orders require any specific method by which a caller must obtain such prior express consent . . . and the scope of consent must be determined by the facts of each situation.'" *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 343 (6th Cir. 2016), quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 30 FCC Rcd. 7961 (2015).  Prior express consent to receive text messages is a complete defense to a TCPA claim.

The incontrovertible fact that Plaintiff blatantly lies about in his motion is that he consented to receiving text messages from Defendant.  While he states that he "never provided consent to be contacted on his cellphone" (Dkt. 21 at 9), the undisputed facts clearly show him providing prior express consent to receive the messages he was receiving.  (*Decl., Karczewski*, Exhibit 1 and Exhibit 2 at lns. 2, 842-46, 1,236-37, 3,218-19, 4,008-09, 5,209, 5,232).  Even more, upon receiving text-messaged job offers from Defendant Plaintiff manifested his consent and approval to receive those messages by working literally hundreds of job assignments that were provided to him in the very text

messages he claims to have not wanted.   (*See Decl., Karczewski*, Exhibits 2 and 3). Plaintiff fails to address the consent element of his TCPA claim because he knows it is fatal to his complaint.  By failing to provide evidence showing that he "never provided consent" he has failed to meet his initial burden on summary judgment.  Even if he had provided admissible evidence on the element of consent, Defendant's evidence – at least – presents a genuine issue of material fact on whether prior express consent was provided by Plaintiff before receiving allegedly volatile text messages.

Even more, Plaintiff's insistence on working literally hundreds of jobs that were offered to him via text message clearly manifested his intent to receive text messages such that he could obtain the benefit of well-paying job opportunities.  At no point did Plaintiff opt out of receiving text messages and stop working for PeopleReady.  While he clearly tried to game the system on several occasions he almost instantly continued to respond affirmatively to job offers and accept those offers of employment to his benefit.

### c.  Plaintiff's Failure to Submit Evidence in Support of his Motion Justifies Summary Denial

The Court must carefully review the evidentiary support offered by Plaintiff with his motion.  If a party fails to properly support assertions of fact as required by FRCP 56(c), the Court may issue an order striking the party's summary judgment motion. FRCP 56(e)(4).  Evidence offered in support of summary judgment must be authenticated before the court can consider it in support of such a motion. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F3d 527 (6th Cir. 2002). If a party opposing a FRCP 56 motion believes that materials offered in support of such a motion "cannot be presented in a form that would be admissible in evidence," the opposing party must assert an objection. FRCP 56(c)(2).

In this matter, Plaintiff has made zero effort to authenticate any of the evidence proffered in support of his motion. Moreover, Plaintiff fails to establish the requisite foundation rendering it impossible to determine when the documents were in effect or how (or when) Plaintiff came to possess the documents.  To illustrate these fatal flaws, as Exhibits C, F and K to his motion, Plaintiff attaches four black and white photocopies of what appear to be screenshots from a smart phone. [See Pl's Exhibits C, F and K]. However, the screenshots do not reference any telephone numbers neither for the receiving smart phone nor from the originating source. In addition, Plaintiff makes no effort to authenticate or lay a foundation for Exhibit C, F or K in his declaration [attached as Exhibit B to his motion].  Even more, the only exhibit referenced by Plaintiff in his declaration is Exhibit I.  (Dkt. 21-10).  There is no explanation provided by Plaintiff explaining what Exhibit I is, how he came into possession of that document, why the Court's reliance on its content is justified, or why it is partially redacted.  The Court cannot possibly admit Exhibit I into evidence as proper foundation for that exhibit has not be laid.  Furthermore, Plaintiff's failure to identify any other "Exhibit" attached to his declaration renders his motion completely unsupported by any admissible fact.

### d.  **Plaintiff Fails to Meet his Initial Burden on Summary Judgment by Failing to Show an Absence of Material Fact on any Issue**

#### i.  *Plaintiff fails to establish that the purported offending text messages originated from an ATDS*

Much like his authentication and foundational inadequacies articulated in the previous section, Plaintiff has failed to set forth any evidence that he received text messages from an ATDS. Again, Plaintiff has offered no evidence that would allow the fact finder to determine where the text messages originated from. Not only are the

screenshots completely devoid of this information, Plaintiff makes no effort to clarify this in his declaration.  Plaintiff includes a single sentence in his declaration stating that "on several occasions the Plaintiff text to the automated system (sic) and was replied to in less than a second."  (Dkt. 21-3 at ¶ 15).  However, Plaintiff saying something is an "automated system" does not render something an ATDS.  Also, Plaintiff fails to offer any evidentiary support for his conclusion.

> ii.     *Plaintiff fails to establish that the communication of offers of employment via text message falls within the purview of the TCPA*

Plaintiff's motion is predicated largely on his assumption that the purported offending text messages offering employment opportunities – text messages that Plaintiff routinely relied upon for employment – fall within the scope of the TCPA. As set forth above, however, the TCPA does not address this issue. Similarly, there does not appear to be any case law on this issue that affirmatively holds that such text messages do, indeed, fall within the scope of the TCPA. Further, the argument that Plaintiff's receiving job offer text messages that he specifically requested and successfully capitalized on somehow runs afoul of the overriding rationale of the TCPA barely survives its mention. Ultimately, Plaintiff's unsupported assumption that the TCPA applies to his claim misses the mark.

> iii.    *Plaintiff fails to set forth any evidence as to when and how he consented to receive text messages and then, subsequently, withdrew his consent.*

To be sure, Plaintiff baldly asserts that he never consented to receiving employment opportunity text messages. Plaintiff goes on to allege that he withdrew this consent that he never provided. However, as is the case throughout his motion, Plaintiff fails to offer any evidence to support these contentions. Plaintiff makes vague references

to having opted out from receiving the text messages in his brief as well as in his self-serving "Statement of Undisputed Material Facts." However, the evidence upon which he relies to support this contention – Exhibits C, F and K – lacks even the minimal amount of authenticity and foundation that may have otherwise supported the contention. Again, these screenshots provide no information as to what telephone number received the text messages nor what telephone number sent the text messages. Without this basic, yet critical information, Plaintiff cannot factually establish that (1) he never consented to receive the text messages or (2) that he subsequently withdrew this consent.

### e. **Even if Plaintiff did Carry his Initial Burden, Genuine Issues of Material Fact Exists on Several Issues Barring Summary Judgment**

At a minimum, the existence of genuine issues of material fact requires denial of Plaintiff's motion.  In this case, Plaintiff must prove that the WorkAlert system is an ATDS within the meaning of the TCPA and that Plaintiff did not consent to receive text messages through the WorkAlert system.  While Defendants argue that Plaintiff is unable to contradict the record evidence showing that the WorkAlert system is not an ATDS, any factual dispute on this issue would constitute a genuine issue of material fact.

Here, PeopleReady's declarations and WorkAlert text log shows that the messages were sent by human intervention which attempted to connect very specific jobs with very specific temporary associates.  (*Decl., Knutson*, ¶¶ 5-9; *Decl., Karczewski*, Exhibit 2). At a minimum, this evidence creates a genuine issue of material fact as to whether Defendants used an ATDS.

Additionally, Defendants have shown eight separate instances where Plaintiff expressly consented to receive text messages.  (*Decl., Karczewski*, Exhibit 1 and Exhibit

2 at lns. 2, 842-46, 1,236-37, 3,218-19, 4,008-09, 5,209, 5,232). At a minimum, this evidence creates a genuine issue of material fact as to whether Defendant consented to receive the allegedly offending communication.

### d. Plaintiff's Papers and Declaration Violate Rule 56(h) such that the Court should Order he Pay Reasonable Expenses and Attorney Fees to Defendants in Forcing them to Oppose His Frivolous Motion

FRCP 56(h) provides that the court may order a party submitting a declaration in bad faith to pay the other party's reasonable expenses, including attorney's fees, it incurred as a result of the bad faith filing.

In this case, Plaintiff filed a declaration in which he blatantly lies, stating that he "never provided consent to be contacted on his cellphone." As shown above, Plaintiff provided his express written consent to receive text messages on: July 7, 2011; April 18, 2014; October 9, 2014; February 9, 2015; August 24, 2016; November 10, 2016; February 23, 2017; and, February 27, 2017 – eight (8) separate times. Other lies included Plaintiff's statements that:

- "Defendants retaliated against Plaintiff, and fired Plaintiff as a result of this lawsuit."

- "The Defendants routinely makes (sic) potential workers use the automated system ("work alert") or they would be suspended or fired and not able to provide for a living."

- "The Defendants routinely makes (sic) potential workers use the automated system ("work alert") or they would be suspended or fired and not able to provide for a living."

- "On February 23rd and 26th, Plaintiff again text the work alert system on (4) four occasions and asked the system "to not contact him anymore.""

- "After revoking consent to be contacted on his cellphone, Plaintiff received over five-thousand-six-hundred (5,600) text messages."

All statements are demonstrably false, improper, and submitted with a bad faith purpose – to attempt to obtain a ruling from this court based upon false statements.  As such, sanctions are warranted under FRCP 56(h).

### IV. CONCLUSION

For the foregoing reasons the Court should deny Plaintiff's Motion for Summary Judgment.

Dated: May 7, 2018                          KUIPER ORLEBEKE PC


By:  /s/ Scott W. Kraemer_____
          Scott W. Kraemer (P69822)
          Attorney for TrueBlue, Inc.
BUSINESS ADDRESS:
          180 Monroe NW, Suite 400
          Grand Rapids, MI  49503
          (616) 454-3700