UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN A. GARY,

      Plaintiff,                        Case No: 2:17-cv-10544

v                                  HON. GERSHWIN A. DRAIN

TRUEBLUE, INC. d/b/a
LABOR READY, INC., d/b/a
PEOPLE READY, INC.

      Defendants.

_____/

Kevin A. Gary
Plaintiff *In Pro Per*
3210 Hogarth
Detroit, MI 48207
(313) 894-2330
kagary14@hotmail.com

Scott W. Kramer (P69822)
KUIPER ORLEBEKE PC
Attorneys for Defendants
180 Monroe NW, Suite 400
Grand Rapids, MI 49503
(616) 454-3700
kraemer@kolaw.com

_____

## DEFENDANTS TRUEBLUE, INC. AND PEOPLEREADY, INC.'S MOTION FOR SUMMARY JUDGMENT

Defendant Trueblue, Inc. (also erroneously sued as True Blue Inc. d/b/a Labor Ready, Inc., d/b/a People Ready, Inc.) pursuant to Fed.R. Civ.P. 56 and LR 7.1, moves for summary judgment in its favor for the reason that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. Defendant's motion is supported by its brief and the exhibits attached thereto.

Dated: August 28, 2018

KUIPER ORLEBEKE PC

By:  /s/ Scott W. Kraemer

Scott W. Kraemer (P69822)
Attorney for TrueBlue, Inc.
BUSINESS ADDRESS:
180 Monroe NW, Suite 400
Grand Rapids, MI  49503
(616) 454-3700

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN A. GARY,

     Plaintiff,                  Case No: 2:17-cv-10544

v                            HON. GERSHWIN A. DRAIN

TRUEBLUE, INC. d/b/a
LABOR READY, INC., d/b/a
PEOPLE READY, INC.

     Defendants.

_____/

| | |
|---|---|
| Kevin A. Gary | Scott W. Kramer (P69822) |
| Plaintiff *In Pro Per* | KUIPER ORLEBEKE PC |
| 3210 Hogarth | Attorneys for Defendants |
| Detroit, MI 48207 | 180 Monroe NW, Suite 400 |
| (313) 894-2330 | Grand Rapids, MI 49503 |
| kagary14@hotmail.com | (616) 454-3700 |
| | kraemer@kolaw.com |

_____

## DEFENDANTS TRUEBLUE, INC. AND PEOPLEREADY, INC.'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## STATEMENT OF ISSUES PRESENTED

The issue presented is whether Defendant is entitled to summary judgment under the Telephone Consumer Protection Act ("TCPA") when:

    a.  No Genuine Issues Of Material Fact Exist Because The TCPA Does Not Prohibit The Texting Of Employee-Benefitting Job Offers;

    b.  No Genuine Issue Of Material Fact Exists Because WorkAlert Is Not An ATDS As Defined In The TCPA And Applicable FCC Orders;

    c.  No Genuine Issue Of Material Fact Exists Because Several Steps Of Human Intervention Were Required To Send A Text Message To Plaintiff; and/or

    d.  There Are No Genuine Issues Of Material Fact As To Defendants' Complete Consent Defense.

## STATEMENT OF CONTROLLING AUTHORITY

Defendant's Motion for Summary Judgment is based upon the following authority:

### Statutes

47 U.S.C. § 227 *et seq.*, Telephone Consumer Protection Act ("TCPA")

### US Supreme Court Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

*Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986)

### Federal Circuit Court Cases

*ACA International v. Federal Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018)

*Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 343 (6th Cir. 2016)

*Lawrence v. Bayview Loan Servicing, LLC*, 666 Fed.Appx. 875, 880 (11th Cir. 2016)

*Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009)

*Sandusky Wellness Center, LLC v. Medco Health Solutions, Inc.*, 788 F.3d 218 (6th Cir. 2015)

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950 (9th Cir. 2009)

### Federal District Court Cases

*Derby v. AOL, Inc.*, 2015 WL 3477658 (N.D. Cal. June 1, 2015)

*Duchene v. Onstar, LLC*, 2016 WL 3997031 (E.D. Mich. July 26, 2016)

*Glauser v. GroupME, Inc.*, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015)

*Gragg v. Orange Cab Co.*, Inc., 995 F.Supp.2d 1189, 1193 (W.D. Wash. 2014)

*Hovila v. Tween Brands, Inc.*, 2010 WL 1433417 (W.D. Wash. Apr. 7, 2010)

*Ibey v. Taco Bell Corp.*, 2012 WL 2401972 (S.D. Cal. 2012)

*Jacobs v. Quicken Loans, Inc.*, 2017 WL 4838567 (S.D. Fla. Oct. 19, 2017)

*Lord v. Kisling, Nestico & Redick, LLC*, 2018 WL 3391941 (N.D. Ohio July 12, 2018)

*Luna v. Shac, LLC*, No. 122 F.Supp.3d 936, 939 (N.D. Cal. 2015)

**Federal District Court Cases Continued**

*McKenna v. WhisperText*, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015)

*Marks v. Crunch San Diego, LLC*, 55 F.Supp.3d 1288, 1293 (S.D. Cal. 2014)

*Norman v. Sito Mobile Sols.*, 2017 WL 1330199 (D.N.J. Apr. 6, 2017)

*Ryabyshchuck v. Citibank (S. Dakota), N.A.*, No. 2012 WL 5379143 (S.D. Cal. Oct. 30, 2012)

*Sherman v. Yahoo! Inc.*, 150 F.Supp.3d 1213, 1217 (S.D. Cal. 2015)

*Smith v. Stellar Recovery, Inc.*, 2017 WL 1336075 (E.D. Mich. Feb.7, 2017)

*Thomas v. Abercrombie & Fitch*, – F.Supp.3d –, 2018 WL 1312405 (E.D. Mich. Mar. 14, 2018)


**Other**

23 F.C.C.R. 559 (2008)

27 F.C.C.R. 1830 (2012)

27 F.C.C.R. 15391 (2012)

H.R. Rep. No. 101-633 (1990)

## I.  INTRODUCTION

Plaintiff Kevin Gary ("Plaintiff") filed suit against Defendants TrueBlue, Inc. and PeopleReady, Inc. ("Defendants") for allegedly violating the Telephone Consumer Protection Act ("TCPA").  However, as Plaintiff was told from the very beginning of this case, his claims are at best without merit, and at worst spurious and sanctionable.  First, information-only text messages that singularly communicate job offers to benefit employees are not barred by the TCPA.  No case in the nation has held otherwise.

Second, Plaintiff fails to acknowledge that, in fact, he provided express written consent on no less than eight (8) different occasions to receive text-messaged job offers from Defendants.  He subsequently worked, literally, hundreds of jobs for which he received the job offer via the same text messages that he now claims violated the TCPA.  Not only did Plaintiff provide prior, express written consent to receive text messages, he completely manifested his consent to receive text messages by responding affirmatively to hundreds of job offers, working those jobs, and receiving a substantial benefit from that ongoing business relationship with Defendants. Consent to receive messages is a complete defense to a TCPA claim.

Perhaps most problematic, however, is that Plaintiff cannot ever prove that Defendants' WorkAlert text messaging platform qualifies as an automated telephone dialing system ("ATDS"), as is his burden to move past summary judgment.  Not only is WorkAlert unable to generate and call a list of random numbers, it is undisputed that WorkAlert requires several instances of human intervention to send even a single text message to a worker.  While Plaintiff will inevitably rely on the "potential capacity"

argument to survive summary judgment, that argument was soundly rejected in *ACA International v. Federal Communications Commission*, (D.C. Cir. 2018) 885 F.3d 687.

Having conducted almost no discovery of his own, Plaintiff also has no admissible evidence in support of his claims, as is his burden at this stage. While Plaintiff is self-represented, he is admittedly no stranger to civil litigation. The Court is required to look at the evidence before it and determine whether Plaintiff has provided any evidence sufficient to create genuine issues of material fact justifying a trial in this matter. As there are no triable issues of fact as to (1) the type of messages sent to Plaintiff, (2) Plaintiff's unequivocal consent, (3) that WorkAlert is not an ATDS, and (4) that human intervention is necessary to send text messages to Plaintiff, Defendants' motion for summary judgment should be granted.

## II. STATEMENT OF FACTS

### a. PeopleReady And The WorkAlert System

Labor Ready, the predecessor entity to PeopleReady, is a staffing company that helps place out-of-work, or underemployed blue collar workers with job opportunities, typically with local businesses in the communities it serves. (**Exhibit 1**, *Knutson Declaration*, ¶2).[1] PeopleReady places hundreds of thousands of employees in temporary staffing jobs each year. (*Id.* at ¶3). The jobs are often short term or even daily, and serve as a bridge to permanent employment for job seekers looking to build experience, or prove their worth in a highly competitive job market. (*Id.*). Consequently, PeopleReady's business relies on connecting qualified on-demand temporary workers with those looking to make a daily or short term hire in an efficient and expedient manner. (*Id.*).

---

[1] Plaintiff chose to not depose Ms. Knutson or otherwise challenge any statement made in Ms. Knutson's Declaration.

Traditionally, workers in this industry—and with Labor Ready—would arrive at a labor hall around 5:00 a.m. every morning to see whether there was any work available, and jobs were assigned on a first-come, first-served basis. (*Id.*).

This somewhat antiquated process gave way – as is often the case – to technology that allows a more convenient way for temporary workers to find out about work opportunities. (*Id.* at ¶4). For PeopleReady, this new technology is called the WorkAlert text messaging platform. Now PeopleReady connects people with work through traditional in-branch placement as well as through WorkAlert placement. (*Id.*). WorkAlert saves the potential worker time and money by cutting out the need to travel to the branch – sometimes daily – to determine if work is available on any particular day. Moreover, for those job seekers with childcare challenges, transportation issues, and other barriers to work, this system has greatly expanded opportunities to those who often need it most. WorkAlert also serves PeopleReady's customers because it allows for a cost-effective, efficient way of communicating an available job offer to the right temporary worker--instead of who simply enters a labor hall first in the morning. (*Id.*).

PeopleReady branches interface with both customers and potential workers to find the right fit for each job. (*Id.* at ¶5). Workers are placed with a variety of different customers based on each customer's unique needs. (*Id.*). Workers are selected based on criteria set by both the customer and the PeopleReady branch employees. (*Id.*). Customers can select requirements for workers based on a multitude of factors, including, for example, whether the worker passed a background check, whether the worker holds a particular license or certificate, or whether the worker has worked another job in the last 30 days. (*Id.*). Likewise, the PeopleReady branch employees add their own criteria for

workers over and above what the customer may require, including, for example, the workers' distance from the branch, whether the workers have their own source of transportation, or whether the worker has checked in with the branch within the last 30 days. (*Id.*). The WorkAlert system not only effectively matches customers with temporary workers, but it allows PeopleReady to keep its prices down while providing employment opportunities nationwide based on the unique needs of its customers. (*Id.*).

When a PeopleReady branch employee needs to fill a customer's requirement for a local temporary worker, they have the option of sending a message by SMS that allows the worker to learn of a job opportunity without having to spend time driving to, or waiting at, a hiring hall. (*Id.* at ¶6). Both the branch and the temporary worker benefit by PeopleReady's ability to tailor an offer toward a particular worker who may possess certain skills or attributes desirable for a specific local job opportunity. (*Id.*). For example, a customer may need someone with experience in painting, and even if no person matches that skill set at the hiring hall, a worker who previously indicated that they had experience painting could now receive a text message offering them the job with that particular customer. (*Id.*).

It is always the PeopleReady branch employee's decision to offer an employment opportunity to a potential temporary worker. (*Id.* at ¶7). When a customer contacts his or her local PeopleReady branch, the branch employee is tasked with finding temporary workers to staff the requested position, which will vary depending on many circumstances. (*Id.*). If the branch employee opts to use the WorkAlert text messaging program to fill the position, then the PeopleReady branch employee's first step in placing a temporary employee with a customer is to manually open the WorkAlert web browser

application on their desktop computer in the branch office located in whatever city they may be in. (*Id.*). The branch employee is then required to manually input their credentials in order to log in to the system. (*Id.*).

Next, the branch employee is taken to the "worker search" screen. (*Id.* at ¶8). On this screen, the branch employee uses his or her discretion and independent judgment to input criteria to search for potential temporary employees to staff the position. (*Id.*). The branch employee then chooses to apply any combination of the following search criteria by manually selecting each separate criteria on the search screen: desired zip code and distance from that zip code (these two criteria are required before a search can be conducted by the branch employee); whether the worker is available to take on new work; when the worker last "checked in" to learn about potential work assignments; any special skills required for completing the job assignment; whether the worker must have first passed a background check; whether the worker must have his or her own form of transportation; whether the worker must be licensed or hold a specialized certificate; when the worker was last dispatched; and whether the potential worker has worked for the same customer in the past. (*Id.*). The branch employee then manually hits the "search" button which returns a population of potential temporary workers for the branch employee to consider sending a text message to. (*Id.*). Sometimes, the branch employee will refine the search to produce greater or fewer results based on the results of the first search. (*Id.*). The branch employee can also manually select specific persons to include or exclude from the text message that will ultimately go out. (*Id.*).

Once the branch employee is satisfied with the pool of potential temporary workers resulting from the search criteria selected, he or she then manually composes the

text message that will go out to the employees that have opted into the WorkAlert program. (*Id.* at ¶9). There are no "form" or pre-written text messages that the branch employee can choose from during this process; rather, the branch employee must personally draft each text message by hand. (*Id.*). Finally, the branch employee manually clicks the "send" box in the WorkAlert box which triggers the sending of the message. (*Id.*).

The WorkAlert system limits the total number of persons a branch employee can text at a single time. (*Id.* at ¶10). If the search criteria selected by the branch employee are broad enough or the locale is too densely populated, then the results of any search that are produced will be limited by the system. (*Id.*).

Branch employees are not capable of making calls from the WorkAlert system. (*Id.* at ¶11). Employees cannot export the returned search results from WorkAlert to any other system, using software or by any other means. (*Id.*). There is no way to send a text message with the WorkAlert system without the several steps of human intervention described above. (*Id.*). While WorkAlert allows branch employees to send text messages to specifically-chosen potential temporary employees in groups *that the branch employee creates*, it does not allow for random or sequential messaging to potential temporary employees. (*Id.*). WorkAlert lacks the capability to randomly or sequentially dial or text potential temporary workers. (*Id.*). The logical reason for preventing WorkAlert from simply spamming every potential employee in a town, market, or state, is that the entire purpose of WorkAlert is not to indiscriminately send messages (marketing or otherwise) to random individuals; rather, it is to reach out to job seekers to connect them with opportunities they had indicated they are interested in. (*Id.*). There is no technology that,

if added to the WorkAlert system, would allow calls or text messages to be sent automatically and without any human intervention to groups of potential temporary workers. (*Id.*).

### b. Plaintiff's Lengthy Employment With PeopleReady And His Repeated Express Consent To Receive WorkAlert Text Messages

Plaintiff first applied to work for Labor Ready on July 7, 2011. (**Exhibit 2**, *Karczewski Declaration*, ¶2 and Exhibit A thereto). In his application of that date, which Plaintiff signed, he gave his "express permission and consent" to be contacted by Labor Ready for the purpose of "alerting me to new job opportunities at Labor Ready." (*Id.*; **Exhibit 3**, *Gary 5-11-18 Deposition attached without exhibits*, 126:9-127:4 and **Exhibit 5** (Exhibit 14 to Gary 5-11-18 Deposition) On April 18, 2014, Plaintiff texted "Yes" to be opted into the WorkAlert text messaging system. (Exhibit 2, *Karczewski Declaration,* ¶3, and Exhibit B thereto). He was then informed, "You're now signed up to receive job alerts from Labor Ready that match your skills. Reply STOP to cancel, HELP for help. 60 msg/mo Msg&data rates may apply." (*Id.*) At that point, Plaintiff began receiving hand-crafted job offers from several branches in the greater-Detroit area.

He accepted job offers on May 11, June 2, June 5, June 10, June 17-18, June 22-23, June 28-30, July 7, July 9-10, July 17-18, July 20-21, July 29, August 1, August 7-8, August 13-15, August 20-21, August 23-25, September 5, September 7, September 12, September 19-20, September 22, September 29, and October 2-3 in the year 2014. (*Id.* at lns.[2] 50-52, 90-91, 95-96, 122-23, 147-48, 189-90, 201-02, 216-217, 231-32, 241-42, 262-63, 265-66, 277-78, 297-98, 305-06, 313-14, 322-23, 336-37, 349-350, 363-64, 378-79, 386-87, 397-98, 426-27, 439-40, 461-62, 470-71, 478-79, 496-97, 531-33, 544-45,

---

[2] All citations to Exhibit B to the Karczewski Declaration (Exhibit 2), the text message log, pin cite to the line numbers ("ln") found therein.

566-69, 573-74, 586-87, 672-73, 683-84, 718-19, 729-30, 769-770, 775-76, 787-88, 798-799, 801-02, 805-06, and 818-19).

He then, again, opted into receiving text messages on October 9, 2014 by texting "YES," and was alerted that "You are now signed up to receive job alerts from Labor Ready that match your skills.   Reply STOP to cancel, HELP for help.   60 msg/mo Msg&data rates may apply." (*Id.* at lns. 842-46).   Subsequently, he accepted job offers on October 17, October 22-23, October 30, November 6-7, November 16, November 21, November 25, November 27-30, December 2, 2014. (*Id.* at lns. 897-98, 915-16, 920-21, 943-44, 989-90, 996-97, 999-1,000, 1,028-29, 1,044-45, 1,049-50, 1,052-53, 1,077-78, 1,095-1,096, 1,099-1,000, 1,105-1,106, and 1,110-11).   He continued accepting job offers on January 5, January 8, and January 14, 2015. (*Id.* at lns. 1,179-81, 1,185-86, 1,207-08, and 1,223-24).   He again opted back into receiving text messages on February 9, 2015 and was sent the same confirmatory text message about how to opt out. (*Id.* at lns. 1,236-37).   He accepted job offers on March 15, 17-18, 20, 27, April 24, 28, and 29, 2015 before again explicitly asking to be messaged by Labor Ready, stating "You see my replying.  Put me on. This ticket . . . I am on the text alert." (*Id.* at lns. 1,341-42, 1,357-58, 1,361-62, 1,382-83, 1,386-87, 1,426-27, 1,561-62, 1,587-88, 1,617-18, 1,620-32).   He then accepted job offers via WorkAlert on May 1, 4, 5, 13-14, 19, 21-22, and 26-27, June 2, 4, 7-12, 14-19, 21-23, and 29, July 2, 3, 7, and 17, August 7, 1, 13-14, 17, and 19, September 8, 11-12, and 18-19, October 2,[3] 10, 12, 23, and 30-31, 2015. (*Id.* at lns. 1,636-37, 1,660-61, 1,685-86, 1,743-44, 1,749-50, 1,766067, 1,771-72, 1,807-08, 1,825-

---

[3] In the Court's August 1, 2018 Order, it noted that the Plaintiff's prior express written consent provided in his employment application to receive text messages likely expired 89 days after July 10, 2015. (Dkt. 45 at p. 23).   In which case, none of the text messages before October 7, 2015 could possibly violate the TCPA as his consent would have remained effective through that date.

26, 1,828-29, 1,839-40, 1,854-55, 1,860-61, 1,890-91, 1,899-1,900, 1,910-11, 1,922-23, 1,925-26, 1,931-33, 1,960-62, 1,983-84, 1,990-91, 1,994-95, 1,997-98, 2,055-06, 2,009-10, 2,021-22, 2,027-29, 2,036-37, 2,069-70, 2,075-76, 2,090-91, 2,105-106, 2,124-25, 2,133-34, 2,188-89, 2,216-19, 2,259-2,260, 2444-45, 2459-60, 2,499-2,500, 2,502-03, 2,512-13, 2,532-34, 2,645-46, 2705-06, 2,715-16, 2,732-33, 2,873-74, 2,879-80, 2,945-46, 2,978-79, 2,991-92, 3,046-47, 3,059-60, 3,063-64). He was opted out of receiving text messages due to inactivity on January 1, 2016. (*Id.* at ln. 3,217).

Plaintiff then voluntarily and expressly opted back into receiving text messages on August 24, 2016, receiving the same confirmatory text message in response. (*Id.* At lns. 3,218-19). He then accepted job offers on August 26, 30, and September 1, 5, 8, 15, 2016. (*Id.* at lns. 3,226-29, 3,238-39, 3,241-42, 3,251-52, 2,257-58, 3,294-95, 3,298-99, 3,323-24, 3,329-30, 3,337-38, 3,340-41). On September 17, 2016, he sent two messages to Labor Ready. The first stated "Please do not connect me anymore. Thank you." (*Id.* at ln. 3,347). The next message, ten minutes later, stated "Please don't contect (sic) me anymore." (*Id.* at ln. 3,348). Importantly *neither message clearly indicated that he wanted to withdraw his express, written consent to receive text messages from WorkAlert.* Even so, his actions indicated that he was very happy receiving the messages as he proceeded to accept job offers through WorkAlert on September 17, 19-20, 23-25, 28, and 30, October 1, 3, 5 and 7, November 8, 2016. (*Id.* at lns. 3,369-72, 3,382-83, 3,425-26, 4,432-33, 3,436-37, 3,456-57, 3,462-63, 3,520-22, 3,542-45, 3,554-55, 3,577-80, 3,633-34, 3,664-69, 3,960-61, 3,963-64, 3,967-68).

Not finished yet, Plaintiff again opted back into WorkAlert by texting "START" on November 10, 2016, receiving the same confirmatory text message as before. (*Id.* at

lns. 4,008-09). He continued accepting job offers on November 14 and 15, December 2, 7, 9, 11, 13, 14, 21, 27, and 28, 2016. (*Id.* at lns. 4,030-31, 4,054-44, 4,057-58, 4,065-66, 4,360-61, 4,430-31, 4,436-37, 4,464-65, 4,470-71, 4,535-37, 4,576-79, 4,587-88, 4,594-95, 4,681-84, 4,695-96, 4,709-10). He continued accepting job offers in 2017 on January 5, 9, 13, 17, 20-21, 23, 27, and February 17 and 22. (*Id.* at lns. 4,749-50, 4,759-60, 4,767-68, 4,828-29, 4,842-43, 4,889-90, 4,892-95, 4,929-30, 4,979-80, 5,150-51, 5,195-5,204). Then, on February 23, 2017, at 6:50 a.m., he texted "Please do not contact me anymore. Thank you" to which he received the following message "You are no longer signed up for PeopleReady mobile alerts. Reply with START to reactivate mobile alerts. TnCs at https://goo.gl/EYzmmF." (*Id.* at lns. 5,207-08). Two minutes later, at 6:52 a.m. he texted back "START" and received the same confirmatory response email set forth above. (*Id.* at ln. 5,209). ***Seven seconds later*** he texted back a slightly different sentence "Please don't contact me anymore" which did not solicit an automatic opt out response from WorkAlert. (*Id.* at ln. 5,211).

Plaintiff continued receiving text messages from branch personnel via the WorkAlert system and on the morning of February 27, 2017 he again asked WorkAlert to "not contact me anymore" only to again opt back into receiving messages at 1:33 p.m. that same day by texting "START" to WorkAlert and receiving the same confirmatory response message, accepting another job offer for work ***that same day***. (*Id.* at lns. 5,232, 5,238). Plaintiff would accept sporadic job offers throughout 2017, including on April 6, 14, 19-21, 24, 26-30, May 1-4, 21-22, 24-26, 31, June 1, 3, 6, 20, 23-24, 26-29, July 6, 17, 19, 20, 23, 28, August 6-11, 15, September 14, 22, October 4 and 17. (*Id.* at lns. 5,278-79, 5,915-16, 6,086-87, 6,110-11, 6256-57, 6,289-92, 6,303-04, 6,320-21, 6,345-

46, 6,390-91, 6,453-54, 6,461-62, 6,480-81, 6,484-85, 6,526-27, 6,551-52, 6,561-62, 6,589-90, 6,613-14, 6,634-35, 6,650-51, 6,991-92, 7,006-077, 7,081-82, 7,101-06, 7,109-10, 7,128-29, 7,198-99, 7,228-29, 7,257-58, 7,286-87, 7,338-39, 7,647-48, 7,780-82, 7,795-96, 7,826-27, 7,829-31, 7,861-62, 7,893-94, 7,921-22, 8,003-06, 8,010-11, 8,197-98, 8,281-82, 8,293-94, 8,330-31, 8,334-37, 8,378-79, 8,499-8,500, 8,637-38, 8,653-54, 8,682-84, 8,715-16, 8,727-28, 8,735-36, 8,755-56, 8,791-92, 9,065-67, 9,153-54, 9,195-96, 9,254-55). Plaintiff has never been terminated from employment with PeopleReady. (Exhibit 2, *Karczewski Declaration*, ¶4).

Plaintiff's statements are incredibly inconsistent with respect to consent. He told this Court, plainly, that "Plaintiff never provided consent to be contacted on his cellphone" and that "Plaintiff never opted in to receive text messages!" (Dkt. 20 at p. 9-10). Confronted by the text message log at his deposition, Plaintiff testified that "at the time (he wrote his brief) maybe I felt like it was never." (Exhibit 3, *Gary Deposition*, 150:21-23). Plaintiff finally conceded, stating, "I'm not perfect. I make errors occasionally." (*Id.* at 151:18-19). When asked about the times he expressly opted into receiving messages from WorkAlert, Plaintiff first claimed that every time he opted back in someone at the branch took his phone – against his wishes – and opted him back in. (*Id.* at 152:14-22, 161:9-24). That story changed as he admitted that he did not know whether he, in fact, texted "Start" to opt back into receiving text messages. (*Id.* at 166:18-167:12, 170:3-5). Indeed, he later changed his testimony again agreeing that he did, in fact, expressly opt back into receiving messages. (*Id.* at 173:22-175:7). At his second deposition, Plaintiff changed his story again. This time he testified that when he claimed that branch employees opted him back into WorkAlert, he gave them permission

to take his phone and opt him back in. (**Exhibit 4**, *Gary 8-15-18 Deposition attached without exhibits,* 386:18-387:15). He also testified that he was unable to tell with any certainty which text messages he sent and which text messages were sent by someone else using his phone. (*Id.* at 404:10-19).[4]

### III.   LEGAL ARGUMENT

#### a.   <u>Legal Standards On Summary Judgment</u>

"Summary judgment is appropriate when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the nonmoving party, the movant is clearly entitled to prevail as a matter of law." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950 (9th Cir. 2009) (*Satterfield*), citing Fed.R.Civ.P. 56. A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of a claim asserted. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). Only then does the burden shift to the non-moving party to point to some evidence showing that a genuine issue of material fact does in fact exist. The moving party has no burden to "produce evidence showing the absence of a genuine issue of material fact . . . [rather] the burden on a moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an

---

[4] Curiously, Plaintiff decided to redact a small portion of a policy document provided to him by Defendants when he submitted it to this Court in support of his summary judgment motion. (Dkt. 21-9 at p. 2-3). The redacted portion of this policy document is telling because the language that Plaintiff chose to redact explicitly prohibits branch employees from using a worker's phone to opt the worker into WorkAlert. (**Exhibit 6** at page 1 (Exhibit 18 of the 8-15-18 *Gary Deposition*)). Plaintiff redacted the following language "According to federal law, workers must Opt-in on their own efforts – you can direct them, but they must perform the actions themselves." (Exhibit 4, *Gary Deposition,* 382:21-387:12). Plaintiff could not provide an answer on why he decided to redact only that language. (*Id.* at 385:6-9).

absence of evidence to support the nonmoving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986).

### b. No Genuine Issues Of Material Fact Exist Because The TCPA Does Not Prohibit The Texting Of Employee-Benefitting Job Offers

Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, "was enacted to 'protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers.'" *Satterfield*, 569 F.3d at 954. Congress enacted the TCPA because "telephone subscribers considered automated or prerecorded telephone calls . . . to be a nuisance and an invasion of privacy." 27 F.C.C.R. 1830, 1839 (2012). "When it enacted the TCPA in 1991, Congress was responding to the significant increase in the use of the telephone to market goods and services that had left "'[m]any customers . . . outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.'" *Hovila v. Tween Brands, Inc.*, No. C09-0491, 2010 WL 1433417 (W.D. Wash. Apr. 7, 2010) at *9, quoting Congressional Statement of Findings, § 2(6) of Pub. L. 102-243. Congress' intent was to regulate machines that dial "blocks of telephone numbers." H.R. Rep. No. 101-633 at 2 (1990). "[C]ourts [have] broadly recognize[d] that not every text message or call constitutes an actionable offense; rather, the TCPA targets and seeks to prevent 'the proliferation of intrusive, nuisance calls.'" *Ryabyshchuck v. Citibank (S. Dakota), N.A.*, No. 11-CV-1236, 2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) at *2.

The question before this Court is if any genuine issues of material fact exists as to whether information-only, text-messaged job offers that materially benefit the employee violate the TCPA. There is no case directly on point. However, in *Sandusky Wellness*

*Center, LLC v. Medco Health Solutions, Inc.*, (6th Cir. 2015) 788 F.3d 218, **the Sixth Circuit clarified whether the texting of employee benefit information could violate the TCPA**. The *Sandusky* court found it was not bound by the FCC's interpretation of the TCPA because its "construction follows the unambiguous terms of the statute." *Id.*, at 223. But, it cited the FCC with approval, finding: "the Commission's rules and regulations, [that **texts**] *'that contain only information . . . or employee benefit information' are not advertisements under the Act*." *Id.* Text messages of job offers that "do not solicit business for a commercially available product or service" cannot violate the TCPA. *Id.*

Plaintiff has provided no evidence showing that even a single message that he received was anything other than an offer to work a job, for which he would receive the substantial benefit of a wage. Indeed, at his continued deposition he testified that he never received a single marketing message and that the only text messages he ever received from WorkAlert were "all informational and job offers." (Exhibit 4, *Gary Deposition*, 390:10-391:21). The text message log speaks for itself and shows that not one message was promoting the sale of a good or service to Plaintiff. (Exhibit 2, *Karczewski Declaration*, Exhibit B). The absence of any evidence that Plaintiff was ever sent an advertising or marketing text message is sufficient to enter Summary Judgment in Defendants' favor. *Celotex*, 477 U.S. at 325.

From a public policy standpoint, broadening the TCPA to bar the sending out of job offers to employees with whom a company already has an established business connection makes no sense. That is likely why Defendants have been unable to find a single case in the United States where the TCPA has been applied to communications

14

related to offering individuals temporary employment. To put it directly, the notion that a company connecting workers through individualized text messages with job opportunities in their local communities would face the potential draconian, and company threatening, penalties of the TCPA goes not only beyond Congressional intent, but it falls outside of common sense.

### c.   No Genuine Issue Of Material Fact Exists Because WorkAlert Is Not An ATDS As Defined In The TCPA And Applicable FCC Orders

The TCPA, specifically 47 U.S.C. § 227 (b)(1)(A)(iii), makes it "unlawful for any person . . . to make a call . . . using any automatic telephone dialing system or an artificial prerecorded voice . . . to any . . . cellular telephone service . . . or any service for which the party is charged for a call." *Satterfield,* 569 F.3d at 950. The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity – to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." *Id.,* citing 47 U.S.C. § 227(a)(1). A text message can qualify as a "call" under the TCPA. *Satterfield,* 569 F.3d at 954.

This motion will turn on whether there is a genuine dispute of material fact whether WorkAlert is an ATDS. The FCC[5] has addressed the question of what qualifies as an ATDS. First, in 2003, the FCC reached the unremarkable conclusion that "'predictive dialers . . . fall within the meaning and statutory definition of 'automatic dialing equipment' and the intent of Congress.'" *Luna v. Shac, LLC,* No. 122 F.Supp.3d 936, 939 (N.D. Cal. 2015), quoting 18 F.C.C.R. 14014, 14092 (2003) at 14093. Predictive dialers are equipment that merely "dial numbers from customer calling lists,

---

[5] "[T]he FCC has no authority to modify or definitively interpret any language in § 227(a) of the TCPA." *Marks v. Crunch San Diego, LLC,* 55 F.Supp.3d 1288, 1293 (S.D. Cal. 2014). The FCC's statutory interpretation of what constitutes an ATDS does not bind the courts. *Satterfield,* 569 F.3d at 951.

rather than dialing numbers randomly or sequentially (i.e., increasing the phone number by one digit for each call)" (*Glauser v. GroupME, Inc.*, 2015 WL 475111, at *5 (N.D. Cal. Feb. 4, 2015), citing 18 F.C.C.R. at 14093), and predictive dialers "'predict' when a telemarketer will become available to take a call, effectively queuing callers for the telemarketer" (*Marks v. Crunch San Diego, LLC*, 55 F.Supp.3d 1288, 1293 (S.D. Cal. 2014). The FCC reiterated its conclusion with respect to "predictive dialers" in both 2008 and 2012. 23 F.C.C.R. 559, 566 (2008); 27 F.C.C.R. 15391, 15392 n.5 (2012).

Courts have also weighed in. Most notably, the current binding definition of what constitutes an ATDS is that equipment must have the capacity to "generat[e] [a list of] numbers and then dial[] them." *ACA International v. Federal Communications Commission*, 885 F.3d 687, 702 (D.C. Cir. 2018). This D.C. Circuit Court decision dealt with the FCC's most recent 2015 order. The D.C. Circuit Court found that the FCC's 2015 order was vague as to what "capacity" meant – did the equipment need to have the current capacity to generate and dial a list of numbers or did it merely need the potential capacity, whatever that meant – to do so? Plaintiff argues that the equipment need only have the "potential capacity" to generate and dial a list of numbers, vaguely permitted under the FCC's 2015 order. (Dkt. 21 at p. 13). However, the *ACA International* court specifically addressed this argument and found that "[t]he Commission's capacious understanding of a device's 'capacity' lies considerably beyond the agency's zone of delegated authority for purposes of the *Chevron* framework" and found the FCC's potential capacity test "utterly unreasonable in the breadth of its regulatory inclusion" See *ACA Int'l,* 885 F.3d 687 at 19.

As this Court stated in its most recent order, "The Act defines an ATDS as 'equipment which has the capacity – to store or produce numbers to be called, using a random or sequential number generator.' The statute never mentions a capacity to dial from a set list. Plaintiff does not allege that WorkAlert has the capacity to store or produce numbers using a number generator, and nothing in the record could support such a claim." Dkt. 45 at p. 17-18.[6]

The only admissible evidence on this point comes from Defendants. While WorkAlert allows branch employees to send text messages to specifically-chosen potential temporary employees in groups *that the branch employee creates*, it does not allow for random or sequential messaging to potential temporary employees. (Exhibit 1, *Knutson Declaration*, ¶11). WorkAlert does not allow for random or sequential messaging to potential temporary employees. WorkAlert lacks the capability to randomly or sequentially dial or text potential temporary workers. Plaintiff was asked, "to the best of your ability, tell me why you think WorkAlert is an automatic telephone dialing system as defined by the TCPA." (Exhibit 4, *Gary Deposition*, 359:11-13). He responded by claiming that "WorkAlert is an automated telephone dialing system because it is an internet web-based platform with the capacity to send one or several text messages from our list of workers, which is called a smart group, to send informational text messages through Mblox and Ellis." (*Id.* at 362:12-19). Despite that definition being legally incorrect, Plaintiff offers no factual support for his claim that WorkAlert is, in fact, an ATDS.

---

[6] Courts have found similar insufficient allegations in plaintiffs' pleadings to be grounds to dismiss TCPA complaints. *Lord v. Kisling, Nestico & Redick, LLC*, 2018 WL 3391941 at *3 (N.D. Ohio July 12, 2018); *Norman v. Sito Mobile Sols.*, 2017 WL 1330199 at *3 (D.N.J. Apr. 6, 2017).

Because Plaintiff has not, and cannot, create a genuine issue of material fact as to whether WorkAlert is an ATDS, this Court must grant summary judgment on the issue in Defendants' favor. Plaintiff fails to identify one piece of admissible evidence sufficient to show that WorkAlert is an ATDS. As such, summary judgment must be granted. *Celotex*, 477 U.S. at 325.

### d.    No Genuine Issue Of Material Fact Exists Because Several Steps Of Human Intervention Were Required To Send A Text Message To Plaintiff

The FCC's 2008 opinion also explained that "the 'basic function' of an autodialer is 'the capacity to dial numbers without human intervention.'" *Glauser*, 2015 WL 475111, at *6, quoting 23 F.C.C.R. at 566. "[T]he FCC instructed that 'how the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.'" *Sherman v. Yahoo! Inc.*, 150 F.Supp.3d 1213, 1217 (S.D. Cal. 2015), quoting 30 F.C.C.R. 7961, 7975 (2015). In the text messaging context, the issue of whether equipment is an ATDS turns on whether the equipment has "the capacity to send text messages without human intervention." *Gragg v. Orange Cab Co.*, Inc., 995 F.Supp.2d 1189, 1193 (W.D. Wash. 2014). *See also Glauser*, 2015 WL 475111, at *6; *Luna*, 2015 WL 4941781, at *4; *Derby v. AOL, Inc.*, 2015 WL 3477658, at *4 (N.D. Cal. June 1, 2015); *McKenna v. WhisperText*, 2015 WL 428728 at *4 (N.D. Cal. Jan. 30, 2015); *Marks*, 55 F.Supp.3d 1288. This District Court adopted the human intervention test in *Duchene v. Onstar, LLC*, 2016 WL 3997031 at *4 (E.D. Mich. July 26, 2016); *Smith v. Stellar Recovery, Inc.*, 2017 WL 1336075, at *6 (E.D. Mich. Feb.7, 2017).

The uncontroverted facts demonstrate the need for several instances of human intervention before a text message could have been sent to Plaintiff. Plaintiff's summary judgment motion concedes this point, succinctly, stating "*a user* opens up Ellis, and gathers messages to a group of messages to send."[7]  (Dkt. 21 at 12, emphasis added). Defendants also submit substantial evidence showing that *WorkAlert requires six (6) steps of human intervention, along with the exercise of discretion and independent judgment of a human being before a text message can be sent out to Plaintiff*.  (Exhibit 1, *Knutson Declaration*, ¶¶7-9 [before any text can be sent using the WorkAlert system the following steps of human intervention must occur; the branch employee must manually: (1) open WorkAlert, (2) log in to WorkAlert, (3) select search criteria from the worker search screen, (4) enter his "Search" to populate the potential worker pool, (5) compose the text, and (6) hit "Send" to actually send the text message]).  This amount of human intervention is more than enough for this Court to find that WorkAlert does not qualify as an ATDS.  The Court appears to have agreed with this argument, stating that "[t]his level of human judgment and intervention precludes a system from falling under the definition of an ATDS." (Dkt. 45 at p. 19).  Defendants are aware of no TCPA case in the country where as much human intervention has been used to send text messages. Having conceded the human intervention issue, there are no genuine issues of material fact preventing summary judgment here either.[8]

---

[7] Again, Defendants do not know where Plaintiff came up with this "Ellis" statement.

[8] Plaintiff argues that he received "immediate response(s) to his messages in less than a second." (Dkt. 21 at 14, citing Exhibit E, p 1-2).  The evidence cited by Plaintiff, again, fails to support his contention.  When asked about this specific issue at his deposition Plaintiff failed to give even one instance where this actually happened.  (Exhibit 3, *Gary Deposition*, 123:19-124:16).  The only instances when a text message was immediately sent back to Plaintiff was *as is permitted* in response to an opt-in or opt-out message sent by Plaintiff. *Thomas v. Abercrombie & Fitch Co.*, – F.Supp.3d –, 2018 WL 1312405, at *6 (E.D. Mich. Mar. 14, 2018) [permitting out-in response message]; *Ryabyshchuck v. Citibank (South Dakota) N.A.*, 2012 WL 5379143 (S.D. Cal. Oct. 30 2012) and *Ibey v. Taco Bell Corp.*, 2012 WL 2401972 (S.D. Cal. 2012)

### e. <u>There Are No Genuine Issues Of Material Fact As To Defendants'</u> <u>Complete Consent Defense</u>

"There is no one way to provide consent. 'Neither the Commission's rules nor its orders require any specific method by which a caller must obtain such prior express consent . . . and the scope of consent must be determined by the facts of each situation.'" *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 343 (6th Cir. 2016), quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 30 FCC Rcd. 7961 (2015).   Prior express consent to receive text messages is a complete defense to a TCPA claim.   "Consent can be inferred from acts or events."   *Jacobs v. Quicken Loans, Inc.*, 2017 WL 4838567, at *3 (S.D. Fla. Oct. 19, 2017).   Most important, "words of conduct . . . reasonably understood by another to be intended as consent . . . are as effective as consent in fact."   *Lawrence v. Bayview Loan Servicing, LLC*, 666 Fed.Appx. 875, 880 (11th Cir. 2016).

Plaintiff blatantly misrepresented in his summary judgment motion,  and throughout this case, that he never consented to receiving text messages from Defendants. While he states that he "never provided consent to be contacted on his cellphone" (Dkt. 21 at 9), the undisputed facts clearly show him providing prior express consent to receive the messages he was receiving.   (Exhibit 2, *Karczewski Declaration*, Exhibit A and Exhibit B at lns. 2, 842-46, 1,236-37, 3,218-19, 4,008-09, 5,209, 5,232).   Plaintiff has never addressed the consent element of his TCPA claim because he knows it is fatal to his complaint.   In fact, at his deposition he created an alternate reality where he claimed that on every occasion that he texted back to re-start receiving messages from WorkAlert, that he had his phone taken away from him, without his permission, at the branch by

---

[permitting opt-out responses messages].  Indeed, the Court appears to have agreed with this position in its most recent order.  (Dkt. 45 at p. 21).

people he could not remember or refused to disclose who then manually opted him back in. (Exhibit 3, *Gary Deposition*, 39:22-40:2, 126:8-127:4, 144:1- 175:13). He later changed his story several times - including obstructing evidence by redacting policy language – admitting that he did not know whether he sent opt-in messages and that he, in fact, would have given branch employees permission to opt him back into WorkAlert. (Exhibit 4, *Gary Deposition*, 382:21-387:12, 385:6-9, 404:10-19).

Even more, upon receiving text-messaged job offers from Defendants, Plaintiff manifested his consent and approval to receive those messages by working literally hundreds of job assignments that were provided to him in the very text messages he claims to have not wanted. (See Exhibit 2, *Karczewski Declaration*, Exhibits B and C). Plaintiff's insistence on working literally hundreds of jobs that were offered to him via text message clearly manifested his intent to receive text messages such that he could obtain the benefit of well-paying job opportunities. At no point did Plaintiff opt out of receiving text messages and stop working for PeopleReady. While he clearly tried to game the system on several occasions he almost instantly continued to respond affirmatively to job offers and accept those offers of employment to his benefit.

## IV.  CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment.

Dated: August 28, 2018                                KUIPER ORLEBEKE PC


By:     /s/ Scott W. Kraemer
        Scott W. Kraemer (P69822)
        Attorney for Defendants